# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

DAVID J. RIDGLEY, SR.,       *

Plaintiff       *

v       *       Civil Action No. PX-18-2438

WEXFORD HEALTH SOURCES, INC., *et al*. *

Defendants       *

         ***

## MEMORANDUM OPINION

Plaintiff David Ridgley, an inmate confined at the Western Correctional Institution, filed a civil rights complaint, contending that the named defendants failed to provide adequate medical treatment and in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Defendants Wexford Health Sources, Inc. ("Wexford"), Mahboob Ashraf, M.D., Fatima Hussein, M.D., Asresahegn Getachew, M.D., Ava Joubert-Curtis, M.D., Robustiano Barrera, M.D., Janette Clark, N.P., Holly Pierce, N.P., Stephen D. Ryan, Beverly McLaughlin, N.P., Krista Self, N.P., Michael Klepitch, R.N., Terri Davis, P.A., Marion Diaz, R.N., Dennis Martin, R.N., Ashley Chucci, R.N., Linda Stair, R.N., Jami Wratchford, R.N., and Jennifer Decker, R.N., (collectively the "Medical Defendants") (ECF Nos. 21 & 46) along with Correctional Defendant Warden Richard J. Graham (ECF No. 34) filed Motions to Dismiss or in the alternative for Summary Judgment. The Court notified Ridgley that failure to oppose the motions may result in the Court ruling in Defendants' favor without the benefit of his response. ECF Nos. 22, 35, 47. The Court also gave Ridgley additional time to respond (ECF Nos. 50, 51), but he did not do so. After reviewing the pleadings, the Court finds no hearing necessary. *See* Local Rule 105.6 (D.

Md. 2018). For the reasons that follow, Defendants' motions, construed as Motions for Summary Judgment, are GRANTED.

## I. Background

### A. Procedural History

On August 9, 2018, Ridgley initiated suit in this Court pursuant to 42 U.S.C. § 1983, alleging that he was denied constitutionally adequate medical care regarding his long term knee pain and an array of skin infections. ECF No. 1 at pp. 2-3. The Court required Ridgley to amend the Complaint. ECF No. 3. In response, Ridgley reasserted the same claims and named the individual Defendants. ECF No. 6. Ridgley next filed a "Motion to Amend/Correct" the Complaint to include claims arising in November of 2018 during which time he developed a "staf bump" on his stomach. ECF No. 24. In that same motion, Ridgley also supplemented the facts on which he based his original claims arising from the alleged lack of care for his knee. *Id*. at p. 2.

Reviewing the above-described pleadings collectively, Ridgley brings three primary claims. First, with regard to his knee, Ridgley contends that Defendants delayed or denied him constitutionally adequate medical care. Specifically, Ridgley contends that he began seeking medical care for his knee in June or July of 2017. ECF No. 1, p. 2. The analgesic medication provided, however, did not alleviate his pain, which prompted him to request a series of sick calls through May of 2018. *Id*., p. 3. Ridgley also alleges an array of medical deficiencies, including failure to timely provide diagnostic and medical treatment, causing his condition to worsen. ECF No. 24, p. 2.

Ridgley separately raises that Defendants failed to treat his staph infections. Ridgley particularly contends that in June of 2018, he developed an infection on the back of his right upper leg that "ate all the way to the muscle." ECF No. 24, p. 3. Ridgley also complains of the

2

inadequate care surrounding a staph "bump" on his stomach that he developed in November 2018. ECF No. 24, p. 1. Although he was seen by medical providers, Ridgley avers that they failed to culture the infections or provide constitutionally adequate medical treatment, causing him to suffer four staph infections and one case of MRSA (Methicillin-resistant Staphylococcus aureus) since January 2018. ECF No. 1, p. 3.

Thirdly, Ridgley contends that Defendant Clark ordered his assignment to a bottom tier and bottom bunk and light work duty in retaliation for his having initiated suit. He argues that Clark knew her order would cause him to lose his prison job and be moved off the preferred housing tier, and nonetheless proceeded in retaliation for Ridgley asserting his claims. *Id*. Ridgley asserts separate retaliation claims against Dr. Getachew for how he administered Ridgely's antibiotics.

Defendants have moved for summary judgment and included as evidence Ridgley's verified medical record (ECF No. 21-4; ECF No. 46-4) and declarations of Dr. Getachew (ECF No. 21-5; ECF No. 46-5), Warden Richard J. Graham, Jr., (ECF No. 34-2), and Alicia A. Cartwright, Correctional Officer II (ECF No. 34-3). Ridgley was therefore on notice that the Court construe the motions as ones for summary judgment. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). The Court proceeds accordingly.

### B. Ridgley's Medical History

#### i. Knee Pain

On May 26, 2017, Ridgley first complained of pain in both knees to Defendant McLaughlin, a nurse practitioner. ECF No. 21-4, p. 2. Ridgley did not report any injuries and he had no bruising, decreased mobility, instability, limping, or swelling. *Id*. McLaughlin ordered x-rays of the knees, prescribed Tylenol, and encouraged Ridgley to perform exercises to stretch and

strengthen his quadriceps and hamstrings. *Id*. The x-rays, taken on June 1, 2017, revealed no abnormalities. *Id*., p. 55.

On June 14, 2017, Ridgley returned for a sick call visit, complaining that Ibuprofen and Tylenol did not relieve his knee pain. ECF No. 21-4, p. 5. The nurse on duty referred Ridgley for a medical provider visit. *Id*., p. 6. Ridgley was seen three days later by Defendant Terri Davis, a physician assistant. *Id*., p. 7. Again, Ridgley reported pain in both knees and Davis discussed with him that he should take any prescribed pain relievers with food. *Id*.

A month later, on July 13, 2017, Defendant Nurse Klepitch saw Ridgley during a sick call visit where he complained that he was still having pain in both knees. ECF No. 21-4, p 8. Klepitch referred Ridgley for a medical provider visit, and on July 23, 2016, Defendant Holly Pierce, a nurse practitioner saw him. *Id*., p. 11. Pierce examined Ridgley and noted that neither knee appeared swollen or was warm to the touch and Ridgley had full range of motion. *Id*. Pierce added capsaicin for Ridgley to use topically. *Id*. Pierce also continued Ridgley on Ibuprofen, Glucosamine Chondroitin, and Extra Strength Tylenol. *Id*., p. 12.

Ridgley continued to complain of knee and leg pain. On September 8, 2017, Nurse Diaz evaluated him. ECF No. 21-4, p. 14. During the visit, Ridgley reported that the medications "took some of the pain off but not enough." *Id*. He described the "pain as needles and pins to lateral side of right knee down leg." *Id*. Diaz noted that Ridgley had full range of motion and his knees were not swollen. *Id*. Diaz referred Ridgley for a medical provider visit. *Id*., p. 15.

Within two weeks, Defendant Klepitch evaluated Ridgley again. ECF No. 21-4, p. 16. During that visit, Ridgley complained of worsening pain in his left knee and that it "went out on him a few days ago." *Id*. Ridgley also shared that the knee had been "scoped a few years ago" and that the pain was near the scope area and "feels like broken glass." *Id*. Klepitch documented

4

minor swelling and decreased range of motion in Ridgley's left knee. Again, Ridgley was referred for a medical provider visit. *Id*., p. 17.

Ridgley submitted a sick call slip on March 3, 2018, complaining of knee pain. ECF No. 21-4, p. 82. Defendant, Nurse Dennis Martin, examined Ridgley on March 6, 2018. *Id.*, p. 27. Martin's notes reflect that Ridgley had last received care for his knees in September of 2017. *Id.* Ridgley reported during this visit that Ibuprofen was not effective but he did not want to be given Naprosyn or Tylenol. *Id.* Nurse Martin examined Ridgley and documented that he had good range of motion, was able to bear full weight, but that he had moderate swelling. *Id.* Martin encouraged Ridgley to continue stretching exercises and made another referral for a medical provider visit. *Id.*, pp. 27-28.

In response to another sick call slip submitted on March 14, 2018 for knee pain (ECF No. 21-4, p. 83), Defendant Clark evaluated Ridgley on March 17, 2018. *Id.*, p. 29. Again Ridgley complained of intermittent and worsening of pain in his left knee as well as instability, stiffness, tenderness and weakness. *Id.* Ridgley also reported difficulty climbing stairs, exercising, kneeling and performing unspecified activities of daily living. *Id.* Clark noted that Ridgley's left knee was tender with mildly reduced range of motion. *Id*., p. 30. Clark renewed the prescriptions for Glucosamine Chondroitin and Capsaicin and referred Ridgley to physical therapy. *Id*., p. 33.

On March 29, 2018, Plaintiff was evaluated by Physical Therapist Stephen Ryan. ECF No. 21-4, p. 34. Upon examination, Ryan set as one goal to increase Ridgley's quadricep. Ryan also intended to establish with Ridgley self-management program. *Id.* Ridgley returned for physical therapy on April 8, 2018. *Id*., p. 35.

On April 9, 2018, Ridgley inquired, via sick call slip, about the status of his physical therapy and knee sleeve. ECF No. 21-4, p. 84. He was seen on April 12, 2018, by Nurse Diaz.

*Id.,* p. 36. Diaz noted Plaintiff started physical therapy on April 9, 2018 and advised Plaintiff that she would look into the status of his knee brace. *Id*., pp. 37, 84.

Plaintiff failed to appear for physical therapy on April 16, 2018. ECF No. 21-4, p. 38. During physical therapy on April 18, 2018, Plaintiff reported that his knee popped out while doing sit-ups, and although he experienced some swelling, he did not complain of pain and nothing was altered in his treatment plan. *Id.,* p. 39. However, at physical therapy two days later, Plaintiff reported pain measuring nine of ten in severity. *Id.*, p. 40.

On April 23, 2018, Ridgley complained that the physical therapy exercises increases his pain and causes his knee to "pop." *Id.*, p. 41. The physical therapy assistant noted that he would discuss Ridgley's care with the physical therapist prior to his next visit. On May 3, 2018, Ridgley was reevaluated by physical therapist Ryan. Ridgley reported that physical therapy had not helped, his left knee still gave out, and he experienced some numbness on the back thigh. *Id.,* p. 44. Ryan recommended that Ridgley continue therapy for six additional sessions to help him develop increased left hip strength. *Id.*

On May 13, 2018, Clark evaluated Ridgley again to assess whether he should continue with physical therapy. ECF No. 21-4, p. 45. Ridgley reported to Clark that he did not think therapy was helping. *Id.*[1] Clark noted that Ridgley walked with a "moderate slightly exaggerated limp." *Id.* Clark also inquired about a left knee sleeve that had previously been ordered for Ridgley and ordered new x-rays of Ridgley's left knee, left hip, and lumbar spine. Clark also referred Ridgley to the Regional Medical Director for evaluation. *Id.*, pp. 45, 47. Ridgley's medications were renewed and the x-rays ultimately revealed no abnormalities. *Id*., pp. 48-50.

---

[1] Ridgley also reported to Clark that he had asked psychiatry to increase his anti-anxiety medication because he was feeling more anxious. At Ridgley's February 2019 telemedicine conference with psychiatrist, Afshan Ashai, Ridgley reported decreased anxiety. ECF No. 46-4, p. 13.

On May 22, 2018, Defendant Dr. Getachew evaluated Ridgley via telemedicine conference. ECF No. 21-4, p. 51. Ridgley told Getachew that his knee pain was worsening over the past two years, and the pain is affecting his ability to walk and his sleep. Ridgley also reported he was not able to participate in activities or work, that his left knee popped when he walked, and that he was numb from the knee to mid-thigh. *Id.*, p. 52. Examination showed swelling and tenderness. *Id.* Dr. Getachew concluded that Ridgley may suffer from osteoarthritis or damage to the cartilage and discussed with Ridgley that knee strengthening exercises are important to reduce pain and improve mobility. *Id.* Dr. Getachew also advised plaintiff to use Ibuprofen sparingly and suggested he alternate them with Tylenol. *Id.,* p. 53. Dr. Getachew referred Plaintiff to an orthopedist for further evaluation. *Id.*, pp. 53, 54. Ridgley was also prescribed a knee brace which he received on July 9, 2018. *Id.*, p. 60.

On September 27, 2018, orthopedist Roy Carls, M.D. evaluated Ridgley. ECF No. 21-4, p. 66.[2] After examination, Dr. Carls diagnosed Ridgley as suffering from left knee patellofemoral mild instability with patellofemoral pain syndrome. *Id.* Dr. Carls suggested that scoping Ridgley's knee and performing a lateral release may alleviate his pain. *Id.* Dr. Carls also ordered an MRI and additional therapy. *Id.*

On October 22, 2018, Plaintiff submitted a sick call slip inquiring as to the status of his MRI. ECF No. 21-4, p. 99. On November 11, 2018, Defendant Clark met with Ridgley to discuss the results of Dr. Carls' examination. Ridgley complained of pain and that his knee "gives out" when going up stairs. ECF No. 21-4, p. 70. Ridgley did not want his knee examined although Clark noted that she could not see any outline under Ridgley's pants suggesting that he was wearing his knee brace. *Id.* pp. 70, 74. Clark ordered the MRI, renewed his prescriptions and

---

[2] During the time between Ridgley's telemedicine visit with Dr. Getachew and his evaluation with Dr. Carls, Ridgley submitted eight sick call slips related to his knee pain. ECF No. 21-4, pp. 85-90, 96-98.

advised that he continue with his physical therapy exercises. Clark also and entered temporary orders, to expire in May 2019, for bottom bunking and bottom tier housing, and a no-steps restriction. Clark also ordered that Ridgley be placed on light duty work. *Id*. p. 71-72; ECF No. 46-4, p. 2.

Ridgley submitted a sick call slip on January 9, 2019, complaining of hip, ankle, and knee pain as well as to request mental health services. ECF No. 46-4, p. 54-55. Ridgley failed to attend his appointment on January 12, 2019, but was seen by another nurse on January 18, 2019, during which time he walked with an apparent steady gait. ECF No. 46-4, p. 8.

Three days later, Ridgley had an MRI performed on his left knee. The results showed "minimal meniscal myxoid degeneration and without demonstration of frank tear," and evidence of either bursitis or a ganglion cyst. ECF No. 46-4, p. 10-11.

After the MRI was completed, Ridgley began exhibiting a pattern of asking for medical attention but then refusing to attend the appointments. On January 27, 2019, Ridgley submitted a sick call slip for his knee but then did not attend the appointment on February 1, 2019. ECF No. 46-4, pp. 59, 11. Ridgley also filed three sick call slips shortly after, asking about the MRI results and complaining of pain. ECF No. 46-4, p. 57, 61-63. However, Ridgley then failed to attend scheduled follow-up medical appointments on February 26, 2019 and March 7, 2019. *Id.,* pp. 15, 16. During a visit with Nurse Martin on March 14, 2019 regarding complaints of knee pain, Ridgley noted that he missed one prior appointment with the Regional Medical Director because he had been up all night with knee pain and overslept. ECF No. 46-4, pp. 17, 66.

Ridgley again submitted a sick call slip on March 22, 2019, but then failed to attend the scheduled medical appointment. ECF No. 46-4, pp. 19, 67. On April 1, 2019, Ridgley requested the results of the MRI, stating that he was in pain from "all the extra walking" and that his knee

was "going out" once or twice a day. ECF No. 46-4, p. 71. But then the next day, he refused to attend his medical appointment. *Id.*

On April 27, 2019, Dr. Getachew met with Ridgley again via telemedicine. ECF No. 46-4, p. 20. Dr. Getachew noted that the MRI showed evidence of possible bursitis and a ganglion cyst and he would refer Ridgley for orthopedic follow up. *Id.*, pp. 20, 23. Dr. Getachew also examined Ridgley's knee, noting hyperextension and some tenderness but full range of motion and a strong quadriceps muscle. *Id.*, p. 22. Dr. Getachew also issued Ridgley a cane, which he received on May 2, 2019. *Id.*, pp. 20, 24, 25. The medical records thus reflect that at the time Defendants submitted the record evidence to this Court, Ridgley was pending a follow-up orthopedic consult. *Id.*

### ii. Infections

At the same time Ridgley was treated for his knee pain, he developed several infections. On December 16, 2017, Defendant Dr. Ava Joubert-Curtis admitted Ridgley to the infirmary for infection on his face, noting that Ridgley had been treated intermittently over the last three months for staph infections. ECF No. 21-4, p. 18. Plaintiff was prescribed several antibiotics, including some that were administered intravenously. *Id.*, p. 19. Dr. Joubert-Curtis also ordered blood tests, a culture of the infection, and x-rays of Ridgley's face. *Id*.

On December 18, 2017, Defendant nurse practitioner Self noted that Ridgley's reported, during infirmary rounds, that the culture was positive for MRSA and sensitive to the antibiotic, Vancomycin. *Id.*, p. 20. Ridgley remained in the infirmary receiving antibiotics. *Id.*, p. 22. Several days later, Ridgley continue to have thick purulent drainage from his right nostril and that nursing staff reported difficulty maintaining an intravenous line. *Id.* Clark reviewed Ridgley's culture and noted that the MRSA was also sensitive to Tetracycline, which she thereafter

9

prescribed along with saline or sterile water nasal flushes. *Id.* Ridgley was discharged from the infirmary the following day. *Id.*, p. 25. Several days later, on January 12, 2018, Ridgley was seen by Self. ECF No. 21-4, p. 25. Nurse Self described Ridgley's facial infection as resolved and noted that Ridgley would finish his antibiotic the following day. *Id.*

Five months later, on June 22, 2018, Plaintiff was seen by Nurse Martin regarding a complaint of a boil on the back of Plaintiff's right leg which was red, swollen, tender, and draining. ECF No. 21-4, p. 56. Martin cleaned and dressed the wound, and provided dressing supplies and Bactrim for Ridgley to continue treatment. *Id.* Ridgley was also prescribed antibiotics in light of his recurrent bacteriologic infections and the open boil. ECF No. 21-4 p. 118.

On July 9, 2018, Nurse Martin next met with Ridgley in response to his July 2, 2018 sick call concerning his need for additional dressing supplies to care for the boil on his leg. ECF No. 21-4, pp. 58, 93. On July 15, Defendant McLaughlin evaluated Ridgley and determined that his leg infection had resolved and no further treatment was needed. ECF No. 21-4, p. 61.

On September 23, 2018, Nurse Martin saw Ridgley concerning a new boil on his lower abdomen. ECF No. 21-4, p. 64. The area was red and tender. Martin advised Ridgley to keep the area clean and dry, provided him Bactrim DS, and referred him to a provider for follow up. *Id.* Six days later, Defendant Clark met with Ridgley to address complaints of three abscesses on his abdomen. ECF No. 21-4, p. 67. Clark observed that the abscesses were not draining. *Id.* Clark noted that Ridgley was angry because he had previously not experienced these medical issues until he came to WCI. Ridgley conveyed that "no one was helping him," and he had a good legal case. *Id.* After a brief discussion that included Ridgley referencing his law suit, Clark ended the visit, but also ordered oral antibiotics for Ridgley and requested that the Regional Medical Director review Ridgley's treatment plan.

On November 24, 2018, Defendant Martin again saw Ridgley for a boil on his stomach. ECF No. 21-4, p. 75. Martin prescribed antibiotics and dressing supplies and referred to a provider. *Id*. Later that day, Defendant Self saw Ridgley in another sick call. *Id*. Self noted the antibiotic previously prescribed was not in stock. *Id*. Self also collected a culture and added Ridgley to the dressing change pass list. Additionally, she advised infection control and Clark of Ridgley's condition. *Id*.

On November 27, 2018 and December 2 and 3, 2018, Ridgley refused to have his dressing changed. ECF No. 46-4, pp. 3, 4, 5. Ridgley also failed to appear for his wound check on December 3, 2018. ECF No. 21-4, p. 78. All told, Ridgley failed to comply with his wound treatment for at least one month. Id. 79.

Six months later, on May 3, 2019, Ridgley again presented to Defendant Hawk for a boil on his stomach. ECF No. 46-4, p. 26. The area was described a dime sized, flat, red, and not appearing infected. *Id*. Hawk directed Ridgley to return if his symptoms worsened. *Id*., p. 27. On May 21, 2019, Ridgley was seen in sick call regarding a reddened area on the left side of his stomach that reportedly first appeared on May 7, 2019. *Id*., p. 28. The area was draining, and a culture taken. *Id*. The culture was positive for MRSA and McLaughlin ordered Bactrim and wound care and directed Ridgley to follow up with the medical department. *Id*. at p. 30. Ridgley failed to appear for wound care on June 1, 2019. *Id*., p. 31.

Dr. Getachew also attests that Ridgley was not compliant with his medication which is why Ridgley was required to present to the dispensary every night for his prescribed mental health medication. ECF No. 46-5, ¶ 5. Dr. Getachew further explains that frequently inmates are non-compliant with antibiotic prescriptions which contributes to the development of antibiotic resistant bacteria. ECF No. 46-4, ¶ 7. Pill call is one effective way to monitor inmate compliance with

taking the prescribed medication. *Id*. To help combat Ridgley's persistent infections, Dr. Getachew prescribed one week of Bactrim to be administered twice daily at pill call. ECF No. 46-4, ¶ 7. Plaintiff failed to appear for six of the 15 medication calls, while only missing one dose of his mental health medication during the same time. *Id*.

In November of 2018, Ridgley was diagnosed with an infection and prescribed a ten-day course of the antibiotic Monodox to be administered at pill call. ECF 46-4, ¶ 8. Ridgley failed to appear for every morning dose and one evening dose of the antibiotic. *Id*. He took all of his evening doses of his mental health medication during that time. *Id*. Additionally, Ridgley missed appointments for dressing changes and wound care. *Id*., ¶ 10. Accordingly, the dressing changes were discontinued. *Id*. And in May of 2019, when Ridgley was again diagnosed with an infection, he was provided a ten-day antibiotic prescription to keep on his person in an attempt to secure better compliance with taking his medication. ECF No. 46-4, ¶ 9.

## II.     Standard of Review

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party's statement of a fact is "blatantly contradicted by the record, so that no reasonable jury could believe it," the Court credits the record over the averred fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

**III.     Analysis**

   **A.     Wexford**

Ridgley's theory of liability as to Defendant Wexford is premised exclusively on the doctrine of *respondeat superior*. However, liability through a mere agency relationship is not available for § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (holding that there is no *respondeat superior* liability under § 1983). Assuming that Wexford is a state actor for § 1983 purposes, it cannot be liable solely on the theory *respondeat superior*. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009). Rather, the record evidence must demonstrate that Wexford, through its supervisory staff and structure, deprived Ridgley of his Eighth Amendment rights by virtue of implementing an unconstitutional policy, practice or custom. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). No evidence meets this requirement, nor has Ridgley even pleaded this liability theory. Thus, the Court grants summary judgment in favor of Wexford.

   **B.     Individual Defendants**

Several of the named defendants had little to no involvement in Ridgley's care and even Ridgley does not contend otherwise in his Complaint allegations. Claims for constitutional deprivation brought pursuant to 42 U.S.C. § 1983 attaches only where the individual defendant participated personally in the alleged deprivation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

First with respect to the Warden, Bishop does not provide any medical care to any inmate. ECF No. 34-2, ¶ 2. Rather, as Warden, Bishop relies on the judgement of the trained medical staff. *Id.*, ¶ 4. To the extent Bishop played any role in Ridgley's ARPs regarding his medical care, such

involvement does not amount to sufficient personal participation in the denial of medical care to withstand challenge. *Whitington v. Ortiz*, 307 Fed, Appx. 179, 193 (10th Cir. 2009) (unpublished); *Larson v. Meek*, 240 Fed. Appx. 777, 780 (10th Cir. 2007) (unpublished). Summary judgment is granted in Bishop's favor

Similarly, Defendants Mahboob Ashraf, M.D., Fatima Hussein, M.D., Robustiano Barrera, M.D., Terri Davis, P.A., Ashley Chucci, R.N., Linda Stair, R.N., Jami Wratchford, R.N., and Jennifer Decker, R.N., are merely named in the Complaint. But no evidence reflects that any of these Defendants had any personal involvement in the provision of Ridgley's medical care. Accordingly, the Defendants' motion as to these named providers is granted.

### C. Remaining Named Defendants – Denial or Delay of Medical Care

As to the remaining Defendants, the record evidence viewed most favorably to Ridgley does not support an Eighth Amendment violation based on denied or delayed medical treatment. The Eighth Amendment to the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state a claim for constitutional denial of medical care, a plaintiff must demonstrate that defendant's acts or omissions amounted to deliberate indifference as to plaintiff's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff, aware of prisoner's need for medical attention, failed to either provide such care or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Scinto v.*

14

*Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). "A medical condition is shown as objectively serious when it 'would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Formica v. Aylor*, 739 Fed Appx. 745 (4th Cir. 2018), *citing Gayton v. McKoy,* 593 F.3d 610, 620 (7th Cir. 2010).

Additionally, as to a defendant's subjective recklessness, "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the plaintiff demonstrates a defendant's deliberate indifference, an official may nonetheless still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

First with regard to Ridgley's knee pain, although the record demonstrates that he was suffering from a serious medical condition, he cannot otherwise demonstrate that Defendants were deliberately indifferent to that need. Defendants responded to Ridgley's complaints of pain initially with a conservative course of medical treatment, then physical therapy and assistive devices such as a brace and a cane, a bottom tier, bottom bunk assignment and light work duty. In response to his persistent complaints, Defendants also referred Ridgley to be evaluated by an

orthopedic surgeon and for an MRI. At the time that Defendants filed their motion, Ridgley was pending yet another consult with an orthopedic specialist to address the MRI findings.

Moreover, although Ridgley knee pain has been chronic and longstanding, the record evidence viewed most favorably to him demonstrates that he also, on many occasions, contributed to the delay of treatment. Ridgley refused to attend scheduled medical appointments or to cooperate with examinations and offered treatment plans. To the extent a reasonable factfinder could conclude that Ridgley had to wait some time to receive his knee brace or other assistive devices, such delay was not unreasonable when considering Ridgley's own refusal to participate in his care. *See e.g.*, *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan,* 511 U.S. 825, 837 (1994), *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.,* 621 F. App'x 732 (4th Cir. 2015) (treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness).

Furthermore, the record viewed most favorably to Ridgley reflects that Defendants responded reasonably to Ridgley's complaints. Ridgley was regularly referred for medical consults and diagnostic tests and to specialists. He has been provided constitutionally adequate medical treatment and accommodations. On this record, no reasonable factfinder could conclude that his provision of medical care to be so inadequate so as to support an Eighth Amendment claim. *Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care" or mere negligence in treatment is insufficient to state an Eighth Amendment claim.)

As to Plaintiff's chronic skin infections, the record evidence compels a similar result. Although Ridgley's bouts with MRSA are undoubtedly serious, Defendants treated him with appropriate medications and admitted him to the infirmary for more intense care. Ridgley however, often did not comply with the prescribed treatment, including his refusal to change his

wound dressing or to take his medications as directed. Because Ridgley's claims, at best sound in medical negligence, they are insufficient to proceed under § 1983.[4] Summary judgment as to these Defendants is granted.

### D. Retaliation

Ridgley separately asserts that Defendant Clark retaliated against him for filing this lawsuit. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected his First Amendment rights; and (3) a causal relationship exists between the protected activity and the defendant's conduct. An inmate's right to initiate suit about prison conditions, "free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017) (recognizing protected right to be free from retaliation for filing prison grievances). *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Retaliatory conduct is any act that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy,* 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine,* 411 F.3d at 500).

Ridgley contends that Defendant Clark retaliated against him by assigning him to the first floor tier and bottom bunk as well as placing him on light duty work status, knowing that he would

---

[4] Further, this Court declines to exercise supplemental jurisdiction over any common law medical negligence claims. 28 U.S.C. § 1367(c)(3). *See also Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Any medical negligence claim must first be filed before the Maryland Health Claims Arbitration Board as a condition precedent to filing suit in court. *See* Md. Code Ann., Cts & Jud. Proc. §3-2A-04 et seq. *See Attorney General v. Johnson*, 385 A.2d 57 (Md. 1978. Ridgley does not aver that he has satisfied this prerequisite.

17

be removed from his prison job and preferred housing. Although, an inmate lacks a general right to a prison job or a particular housing assignment, *see Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992), the conduct alleged could constitute an adverse action sufficient to support a retaliation claim. *Martin*, 858 F.3d at 250 (finding that placing an inmate in administrative segregation can constitute an adverse action for purposes of a retaliation claim).

However, Ridgley must also demonstrate a causal connection between exercising his First Amendment right to petition for redress of his grievances and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. This requirement necessitates, at a minimum, a showing that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *Id.*

Ridgley initiated this lawsuit on August 9, 2018. ECF No. 1. Ridgley also told Defendant Clark about the lawsuit during the September 29, 2018 medical visit. However, Clark did not implement the complained-of restrictions until November 11, 2018. During that visit, Ridgley and Clark reviewed the MRI results and discussed next steps in the treatment plan consistent with the MRI findings. Ridgley also specifically complained that his knee "gave out" when he used the stairs. No mention was made at this visit of any pending lawsuit. Accordingly, when viewing the record most favorably to Ridgley, no rational fact finder could conclude that Clark's imposition of the medical restrictions to address Ridgley's complaints were connected to his having filed a lawsuit three months' prior. ECF No. 11.

Ridgley also appears to argue that Dr. Getachew's directives for Ridgley to receive his antibiotics via pill call were also retaliatory. However, the record evidence demonstrates that Ridgley was not taking his medication when left to his own devices. Further Ridgley's history of MRSAs rendered his medication compliance even more critical to guard against further

18

development of a drug resistant bacteria. By contrast, no evidence exists that Getachew ordered Ridgley to receive his medication at pill call in response to the pending lawsuit. The Court therefore grants summary judgment on the retaliation claim.

### E. Injunctive Relief

Finally, the Court cannot accord Ridgley his requested injunctive relief. A preliminary injunction is an extraordinary and drastic remedy to be granted sparingly. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). Because Ridgley has failed to demonstrate the likelihood of success on the merits, this alone defeats his request for injunctive relief. Alternatively, Ridgley has failed to demonstrate that the balance of equities tip in favor of granting the injunction or that such relief is in the public interest.

## IV. Conclusion

Defendants' Motions for Summary Judgment are granted as to all claims. A separate Order follows.

   9/13/19                                                      /S/

Date                                                              Paula Xinis
                                                                    United States District Judge